**Sharon K. HENGGELER, on behalf of herself and all others similarly situated; and David Randall, on behalf of himself and all others similarly situated; Plaintiffs,**

v.

**BRUMBAUGH & QUANDAHL, P.C., LLO, Kirk E. Brumbaugh, Mark Quandahl, Livingston Financial, LLC, Midland Funding, LLC, a Fictitious Name; and LVNV Funding, LLC, Defendants.**

No. 8:11CV334.

United States District Court, D. Nebraska.

Sept. 12, 2012.

**1182**

O. Randolph Bragg, Horwitz, Horwitz Law Firm, Chicago, IL, Pamela A. Car, William L. Reinbrecht, Car, Reinbrecht Law Firm, Omaha, NE, for Plaintiffs.

Cory J. Rooney, Brumbaugh, Quandahl Law Firm, Elizabeth A. Culhane, Joseph E. Jones, Luke J. Klinker, Fraser, Stryker Law Firm, Douglas E. Quinn, J. Scott Paul, Lauren R. Goodman, McGrath, North Law Firm, Omaha, NE, for Defendants.

## MEMORANDUM AND ORDER

JOSEPH F. BATAILLON, District Judge.

This matter is before the court on the motion of defendant Midland Funding, LLC, to Stay and to Compel Arbitration, or Alternatively, to Dismiss in Favor of Arbitration, Filing No. 45.[1] This is a putative class action for violations of the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. § 1692. The plaintiffs, Sharon K. Henggeler and David Randall, on behalf of themselves and all others similarly situated, allege that defendants violated the FDCPA by sending letters that made several misrepresentations, misidentified the true collector, and misled them about the level of involvement of an attorney in the collection process. Defendants Midland Funding, LLC ("Midland"), Livingston Financial, LLC, and LVNV Funding, LLC, are debt collectors.[2] De-

---

1. The plaintiff has also submitted additional authority to the court and the defendant has objected to it. *See* Filing No. 64 & Filing No. 65. The court finds the objection should be overruled, and will consider the authority to the extent relevant to issues in this case. Because the additional authority, *Webb v. Midland Credit Mgmt., Inc.*, 2012 WL 2022013 (N.D.Ill. May 31, 2012), deals with a hearsay objection to evidence purportedly establishing a valid agreement to arbitrate, the court will construe the plaintiff's submission as a similar hearsay objection.

2. More specifically, they are "debt-buyers." A debt buyer purchases consumer debts that have been written off by the original creditor, generally acquiring the debts for a fraction of the balance, and then attempting to collect the entire debt. *Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1059 (9th Cir.2011). Because a debt-buyer has no ongoing relationship with the consumer and no incentive to create goodwill, a case involving a debt buyer, as opposed to the entity that actually extended credit to the consumer, raises different concerns. Federal Trade Commission, *Collecting Consumer Debts: The Challenges Of Change, A Workshop Report* at 5 (Feb.2009), *available at* http://www.ftc.gov/bcp/workshops/debt collection/dcwr.pdf (discussing some of the consumer challenges raised by the advent of the debt-buying industry).

fendant Brumbaugh & Quandahl, P.C., LLO, is a debt collector and law firm; and defendants Kirk Brumbaugh and Mark Quandahl are attorneys. The law firm and attorneys allegedly acted on behalf of the debt-collector defendants in attempts to recover alleged debts from the plaintiffs.

Defendant Midland argues that it is the assignee of all right, title and interest in an alleged credit card debt owed to Chase Bank U.S.A., N.A. ("Chase") by plaintiff Sharon Henggeler. It seeks to enforce the arbitration provision contained in the agreement. Plaintiff Henggeler opposes the motion. She argues that the parties did not enter into a binding arbitration agreement and she never agreed to arbitrate. She contends she never signed the arbitration agreement or the credit card, never used the card, and never made payments on the card. Further, she argues that if an arbitration agreement exists, her FDCPA claim falls outside the scope of the arbitration clause and it is unconscionable as a matter of law. She also argues that Midland has waived any right to arbitrate the dispute by electing to file a collection action in a judicial forum.

In response to Henggeler's opposition, Midland argues that "[r]egardless of the lack of Plaintiff's signature on the back of the card or on the Agreement or on the Arbitration Clause, Midland will demonstrate that the Plaintiff agreed to the terms of the Agreement—and therefore the Arbitration Clause, either by virtue of the terms of the Agreement, the Truth in Lending Act, or the fact that Plaintiff's daughter was her agent for receipt of that information from Chase at the Plattsmouth address." Filing No. 62, Midland's Reply Brief at 2.

## BACKGROUND

### Facts

Defendant Midland relies on an arbitration clause contained in a purported cardmember agreement between Chase Bank and Sharon Henggeler. Midland proffers the declaration of Christina Paperman, "as Attorney in fact of Chase Bank U.S.A.," who declares "she is authorized by Chase Bank, U.S.A., N.A." to make the declaration and is "familiar with the records referenced in this declaration concerning Plaintiff, Sharon K. Henggeler's credit card account with Chase." Filing No. 46, Index of Evidence ("Evid."), Ex. 1, Declaration of Christina Paperman ("Paperman Decl.") at 1 (Doc # 46–1, Page ID # 234). She states that "[i]n the course of [her] duties [she has] access to certain credit card account customer records of Chase made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person having knowledge of those matters." *Id.* Further, she states "as a matter of Chase's routine and customary business practices, followed in the ordinary course of Chase's business, on or about February 11, 2005, Chase provided a Cardmember Agreement to Plaintiff along with a credit card account currently ending in 6893." *Id.* A copy of "the applicable" Cardmember Agreement, "as amended" is attached to the declaration. *Id.* at 2; Ex. 1, Mastercard and Visa Cardmember Agreement (Doc # 46–1, Page ID # 236–53). There is otherwise no evidence that the agreement was mailed to Ms. Henggeler. *Id.* The document has a copyright date of 2004 and appears to be a standard preprinted form that does not include a signature line for either party. *Id.* The print is small and the quality of the reproduction is poor. *Id.* There is no indication that the plaintiff had any opportunity to change or negotiate the terms. *Id.* The amendments to the original agreement show a mailing address of "Sample A. Sample, 1234 Main Street, Any Town, U.S.A. 00000." *Id.*, Ex. 2 at MID 0014 (Doc # 46–1, Page ID # 249). Also submitted is the heading for a July 30, 2007

amendment to the arbitration agreement but the follow-on language for the next page is not included. *Id.*, Ex. 1 at Page ID # 252.

Paperman further states that "[a]fter the account was opened, Plaintiff made transactions using the Account." *Id.*, Paperman Decl. at 2 (Doc # 46–1, Page ID # 235). She states that "[a]s a matter of Chase's routine and customary business practices, followed in the ordinary course of Chase's business, Chase provided periodic account statements to the Plaintiff reflecting, among other things, transactions on the Account since the preceding billing period." *Id.* Also attached to Ms. Paperman's declaration are numerous "copies of a representation of selected account statements." *Id.*, Paperman Decl. at 2, Ex. 2 (Doc # 46–1, Page ID # 253–290; Doc # 46–2, Page ID # 291–334; Doc # 46–3, Page ID # 335–376). However, the statements are redacted to the extent that neither the recipient's address nor any purchases can be determined.[3] *Id.*

Midland identified Ms. Paperman, in answers to interrogatories, as a third-party witness and not an employee or agent of Midland. Filing No. 59, Index of Evid., Ex. 3, Answers to Plaintiff's First Set of Discovery at 3 (Doc # 59–4, Page ID # 525). Midland states that it "is informed and believes that at the time Ms. Paperman signed the affidavit submitted in this action, her title was CCS Vendor Portfolio Liaison and her employer was Chase Bank, and that her job duties included supporting Chase vendors with account level research, forwarding consumer correspondence, providing account docu-

mentations, managing putbacks and recalls, and similar tasks." *Id.*

Midland also submits the affidavit of Kyle Hannan, Business Development Process Manager for Midland Credit Management, Inc., who states that he is "responsible for, among other things, maintaining and overseeing 'media,' i.e., the loan agreements, debt collection records and other account information pertinent to accounts and debts that Midland Credit manages for Midland Funding." Filing No. 46, Ex. 2, Affidavit of Kyle Hannan ("Hannan Aff.") at 1 (Doc # 46–4, Page ID # 377). He states that

> Pursuant to a Credit Card Account Purchase Agreement ("Purchase Agreement"), dated January 5, 2010, between Midland Funding and Chase Bank USA, N.A. ("Chase") and a Bill of Sale, Midland Funding purchased a pool of charged off accounts from Chase, and through that transaction Midland Funding acquired all right, title and interest in an account that had been originally issued by Chase to Plaintiff Sharon Henggeler.

*Id.* at 2. The bill of sale attached to the affidavit provides that

> for value received and pursuant to the terms and conditions of Credit Card Purchase Agreement dated January 5, 2010, between Chase Bank; U.S.A., and Midland Funding, LLC, ... [Chase, as Seller] hereby assigns effective as of the File Creation Date of December 8, 2010 all rights, title and interest of Seller in and to those certain receivables, judgments or evidences of debt described in

---

**3.** In reply to the plaintiff's opposition to the motion, defendant Midland submits one unredacted credit card statement showing the recipient as Sharon Henggeler and the address as 517 S. 5th St., Plattsmouth, Nebraska. Filing No. 63, Index of Evid., Ex. 10, Declaration of J. Scott Paul at 1 (Doc # 63–3, Page ID # 568), Ex. 10A, MID 0018 (unredacted)

(Doc # 63–3, Page ID # 570). Midland further offers a sheriff's return of service indicating that a summons and petition/complaint against Ms. Henggeler was served on "Ben Phillipson of suitable age and discretion" at 517 S. 5th St., Plattsmouth, Nebraska, on July 7, 2011. *Id.*, Ex. 9 (Doc # 63–2, Page ID # 567).

the Final Data File, entitled (Account's Primary File Name) *attached hereto and made part hereof for all purposes.*

*Id.,* Hannan Aff., Ex. A (Doc # 46–4, Page ID # 379). However, there is no "Final Data File" or printout of any data. attached. *See id.* The "number of accounts," "total unpaid balance," "premium" and "due seller" information on the bill of sale document has been redacted as "confidential and proprietary data." *Id.,* Hannan Aff. at 2; Ex. A. Also submitted is a one-page document on Chase letterhead entitled "Closing Statement" showing only that the date of the agreement was January 5, 2010, the buyer is identified as Midland and the seller as Chase, and there is reference to a "File Creation Date" of 12/8/10. *Id.,* Hannan Aff., Ex. A (Doc # 46–4, Page ID # 380). Nothing identifies Henggeler's account as one of those sold as part of the January 5, 2010, transaction. *See id.*

Midland also offers evidence that it adopted the fictitious name "Encore Funding LLC" for use in transacting business in Nebraska because Midland's true name was unavailable for registration as a foreign limited liability company. *See id.,* Ex. 3, Affidavit of Carrie Darling; Ex. 4, Affidavit of J. Scott Paul, Ex A, Certificate of Authority. Midland also submits copies of United States District Court cases involving Midland wherein arbitration has been compelled. *Id.,* Exs. 5–7.

In opposition to the motion, the plaintiff states in an affidavit that she did not live in Plattsmouth, Nebraska at any time relevant to this claim and that she never saw the cardmember agreement. Filing No. 59, Index of Evid., Ex. 1, Affidavit of Sharon Henggeler ("Henggeler Aff.") at 1 (Doc # 59–1, Page ID # 505–06). She states she never used the account, never benefitted from it, and never received any notice that there was any agreement to arbitrate disputes. *Id.* at 2–3. Henggeler

further states that she did not agree to arbitrate any dispute. *Id.* at 4. Further, she has shown that defendant Midland, under the name of Encore Funding, LLC, filed an action against her for recovery of a debt in Cass County Court on June 27, 2011, Case No. CI 11–520. *Id.,* Ex. 1, Henggeler Aff. at 2, Ex. 1 A, Complaint and Answer (Doc # 59–2, Page ID # 509– 11). In her answer, Henggeler denied owing the debt and stated that, "she is not and has not been a resident of Cass County, Nebraska." *Id.* The Cass County case was dismissed without prejudice on Midland's motion on October 11, 2011. *See id.,* Ex. 1 B, Order of Dismissal (Doc # 59–2, Page ID # 514). In Answers to Interrogatories, Henggeler acknowledges that Chase issued a Mastercard to her in February of 2005, but denies she received a Cardmember Agreement that contained an arbitration agreement from Chase. She also denies signing the card. Filing No. 63, Index of Evid., Ex. 8 (Doc # 63–1, Page ID # 562 & 563).

The plaintiff has also submitted a declaration of counsel showing that the affidavit of counsel showing that her search of the Nebraska statewide electronic filing system (known as JUSTICE) for debt collection cases involving Midland, under the name "Encore Funding, LLC" as plaintiff and represented by defendants Brumbaugh and Quandahl revealed 4,092 cases filed in 2010, 3,738 cases filed in 2011, and 143 cases filed in 2012 to date. Filing No. 59, Index of Evid., Ex. 2, Declaration of Pamela A. Car (Doc # 59–3, Page ID # 515).

## DISCUSSION

*Law*

 "The Federal Arbitration Act, 9 U.S.C. § 4, states that a party aggrieved by the failure of another to arbitrate under a written agreement may petition the dis-

trict court for an order compelling arbitration." *Art Etc. LLC v. Angel Gifts, Inc.,* 686 F.3d 654, 656–57 (8th Cir.2012). A dispute must be submitted to arbitration if there is a valid agreement to arbitrate and the dispute falls within the scope of that agreement. *Lyster v. Ryan's Family Steak Houses, Inc.,* 239 F.3d 943, 946 (8th Cir.2001). "Arbitration is a matter of contract, however, 'and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Art Etc.,* 686 F.3d at 656. (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)); *Lyster,* 239 F.3d at 945 (noting that "a party who has not agreed to arbitrate a dispute cannot be forced to do so").

The issue of whether the parties have a valid arbitration agreement at all is a gateway question that requires judicial resolution. *Green Tree Fin. Corp. v. Bazzle,* 539 U.S. 444, 452, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003) (plurality opinion); *Barker v. Golf U.S.A., Inc.,* 154 F.3d 788, 791 (8th Cir.1998) (stating that "a court must decide whether [an] agreement to arbitrate is valid"). A question of arbitrability arises only in two circumstances— first, when there is a threshold dispute over "whether the parties have a valid arbitration agreement at all," and, second, when the parties are in dispute as to "whether a concededly binding arbitration clause applies to a certain type of controversy." *Bazzle,* 539 U.S. at 452, 123 S.Ct. 2402; *see also Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002). When a party challenges the validity of an arbitration agreement by contending that one or more of its terms is unconscionable under generally applicable state contract law, a question of arbitrability is presented. *See Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) ("[G]enerally applicable contract defenses, such as ... unconscionability, may be applied to invalidate arbitration agreements without contravening § 2 [of the FAA]."); *Cicle v. Chase Bank USA,* 583 F.3d 549, 554 (8th Cir.2009) (same).

The validity of the arbitration agreement is determined by state contract law. *E.E.O.C. v. Woodmen of World Life Ins. Society,* 479 F.3d 561, 565 (8th Cir. 2007); *Lyster,* 239 F.3d at 946 ("State contract law governs whether an arbitration agreement is valid."); *Art Etc., LLC,* 686 F.3d at 656 (8th Cir.2012) (Courts "'apply ordinary state-law contract principles to decide whether parties have agreed to arbitrate a particular matter, giving healthy regard for the federal policy favoring arbitration.'") (quoting *Asia Pac. Indus. Corp. v. Rainforest Café, Inc.,* 380 F.3d 383, 385 (8th Cir.2004)). In addressing a motion to compel arbitration then, courts generally "ask only (1) whether there is a valid arbitration agreement and (2) whether the particular dispute falls within the terms of that agreement." *E.E.O.C. v. Woodmen,* 479 F.3d at 565 (quoting *Faber v. Menard, Inc.,* 367 F.3d 1048, 1052 (8th Cir.2004)).

Under Nebraska contract law, to "create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or binding mutual understanding between the parties to the contract." *Lindsay Ins. Agency v. Mead,* 244 Neb. 645, 508 N.W.2d 820, 825 (1993); *Gerhold Concrete Co. v. St. Paul Fire & Marine Ins. Co.,* 269 Neb. 692, 695 N.W.2d 665, 672 (2005). "A fundamental and indispensable basis of any enforceable [contract] is that there be a meeting of the minds of the parties as to the essential terms and conditions of the proposed contract." *Peters v. Halligan,* 182 Neb. 51, 55, 152 N.W.2d 103, 106 (1967).

Under Nebraska law, "the term 'unconscionable' means manifestly unfair

or inequitable." *Myers v. Neb. Inv. Council,* 272 Neb. 669, 724 N.W.2d 776, 799 (2006). There are procedural and substantive aspects to unconscionability. *Id.* "A contract is not substantively unconscionable unless the terms are grossly unfair under the circumstances that existed when the parties entered into the contract." *Id.; see also Cicle v. Chase Bank USA,* 583 F.3d at 554 (explaining that procedural unconscionability relates to the formalities of the making of an agreement and encompasses, for instance, fine print clauses, high pressure sales tactics or unequal bargaining positions; substantive unconscionability refers to undue harshness in the contract terms) (applying Missouri law). In Nebraska, an essential fact in determining procedural unconscionability is the disparity in respective bargaining positions of parties to a contract. *Myers,* 724 N.W.2d at 799.

 Unconscionability presents a question of law. *Id.* "Usually, the issue should not be determined before the plaintiffs have an opportunity to present evidence of disparity in their bargaining positions and that the provisions unreasonably favored the defendant." *Id.* at 799–800. "Unconscionability is determined in light of all the surrounding circumstances, including (1) the manner in which the parties entered into the contract, (2) whether the parties had a reasonable opportunity to understand the terms of the contract, and (3) whether the important terms were hidden in a maze of fine print." *Parizek v. Roncalli Catholic High Sch.,* 11 Neb.App. 482, 655 N.W.2d 404, 408 (2002).

*Analysis*

 The court finds Midland has not shown that a valid agreement to arbitrate exists. Midland has submitted only a generic cardmember agreement from Chase Bank. The agreement is unsigned and Midland has failed to provide evidence that

Henggeler was a party to the agreement. Henggeler has stated she has not seen the agreement and did not use the credit card in question. Although there is some intimation that the card may have been used by her daughter, Midland has not established an agency relationship and evidence of the daughter's identity or use of the card is lacking. On this record, the court finds there is a failure of proof with respect to a valid arbitration agreement. The court has not been provided with any signed credit card application, credit card agreement or with the affidavit of any person with personal knowledge that Henggeler had signed such an agreement.

Ms. Paperman's affidavit shows on its face that it is not based on first-hand knowledge. She states no more than that she has access to records made by, or made from, information transmitted by a person with first-hand knowledge. The evidence outlining Ms. Paperman's responsibilities ("her title was CCS Vendor Portfolio Liaison ...") is meaningless without some definition of the meaning of those terms or explanation of the functions of that job. She states only that a cardmember agreement was provided to Henggeler, but there is no evidence that Henggeler received it, reviewed it, or agreed to it. The record shows statements were sent to a Plattsmouth address. Midland has not refuted Henggeler's evidence that she did not live at the address and did not receive the statements.

Furthermore, Midland has not shown that it has a valid assignment of the purported debt, if valid, from Chase. The documentary evidence of the sale is incomplete. There is nothing that shows Henggeler's purported account was one of the Chase accounts sold to Midland. The "data file" referred to in the bill of sale was not provided to the court. Further, the sales agreement itself, though refer-

enced in the bill of sale, was not attached and the one-page "closing statement" was extensively redacted. The affidavits on which Midland relies are not based on personal knowledge, contain hearsay and lack foundation.[4]

The court finds it prudent to exercise caution and to demand sufficiently documented proof of consumer indebtedness in a case, such as this, involving a debt buyer. Other courts have noted that "the possibility of a debt collector attempting to collect a debt that it does not actually own, either through assignment or otherwise, is very real." *Webb v. Midland Credit Mgmt., Inc.,* 2012 WL 2022013 at *5 n. 8 (citing Peter A. Holland, *The One Hundred Billion Dollar Problem in Small Claims Court: Robo–Signing and Lack of Proof in Debt Buyer Cases,* 6 J. Bus. & Tech. L. 259 (2011); Rick Jurgens & Robert J. Hobbes, *The Debt Machine: How the Collection Industry Hounds Consumers and Overwhelms Courts,* The Nat'l Consumer Law Ctr. (July 2010), *available at* http://www.nclc.org/images/pdf/pr-reports/debt-machine.pdf); *see also, Midland Funding LLC v. Brent,* 644 F.Supp.2d 961, 970 (N.D.Ohio) (enjoining Midland from using form affidavits that falsely claim to be based on defendant's personal knowledge), *modified on reconsideration, Midland Funding LLC v. Brent,* No. 08 Civ. 1434, 2009 WL 3086560 (N.D.Ohio Sept. 23, 2009) (narrowing order); *Williams v. Javitch, Block & Rathbone, LLP,* 480 F.Supp.2d 1016, 1022–24 (S.D.Ohio 2007) (finding allegations that a debt collector's law firm filed debt collection actions based on affidavits that it "knew or should have known" were not based on personal knowledge stated a claim under the FDCPA).[5] Notably, the Federal Trade Commission's 2009 Workshop Report identified inaccurate information as a serious problem with current debt collection practices. Federal Trade Commission, *Collecting Consumer Debts: The Challenges Of Change, a Workshop Report* at 22, 31 (Feb. 2009) *available at* http://www.ftc.gov/bcp/workshops/debtcollection/dcwr.pdf (noting that debt buyers often receive "only a computerized summary of the creditor's business records when [they] purchase a portfolio" and "typically do not have access to the original credit application with the consumer's signature, the specific contract that applied to the consumer's account, copies of original credit statements, or customer service records that could confirm or clarify a fraud claim or a legitimate consumer dispute"). In 2010, the Federal Trade Commission issued a report that identified and discussed, inter alia, industry-wide problems with debt buyers failing to substantiate their claims against consumers. *See* Federal Trade Commission, *Repairing A Broken System: Protecting*

---

**4.** Like the evidence at issue in *Webb v. Midland Credit Mgmt., Inc.,* 2012 WL 2022013, Midland has failed to lay foundations for exhibits, failed to establish authenticity, and failed to establish that the evidence is not hearsay. In fact, Midland provided less evidence in this case than it did in *Webb.* In *Webb,* the defendant had at least submitted a print-out from electronic records identifying the plaintiff's account as one that had been sold to the defendant. *Webb,* 2012 WL 2022013 at *2.

**5.** *Williams* also involved allegations that the law firm's

"pattern and practice" [was] to prepare and file debt collection complaints attaching affidavits from creditors whose knowledge of the specifics of the original debt is limited or non-existent. The fact of the very high rate of default judgments entered in such collection actions creates a disincentive to "check the truth and accuracy" of its pleadings or its client's affidavits. In the few cases in which a debtor answers the complaint, or seeks discovery, [the law firm] dismisses the lawsuit without prejudice.

*Williams,* 480 F.Supp.2d at 1022.

*Consumers In Debt Collection Litigation and Arbitration* at 18 (Jul. 2010) (hereinafter, "Broken System Rep't"), *available at* http://www.ftc.gov/os/2010/07/debtcollection report.pdf (noting that the age, amount, and quality of debt-related information transferred when debt is sold results in debt collectors increasingly seeking to collect from the wrong consumer, in the wrong amount, or both, and concluding that "neither litigation nor arbitration currently provides adequate protection for consumers"); *see also* Federal Trade Commission, *Annual Report 2011: Fair Debt Collection Practices Act* (2011) at 18, *available at* http://www.ftc.gov/opa/2011/03/fairdebt.shtm (describing an industry-wide investigation that the Commission is conducting of the debt buying industry); Consumer Financial Protection Bureau, *CFPB Annual Report 2012: Fair Debt Collection Practices Act,* App'x A at 3 (2012) (noting that "one of the Commission's major consumer protection concerns is the quantity and quality of information that debt collectors have, use, or convey to others in their collection activities"). The FTC "recognizes that the rigorous application of existing rules in individual cases could mitigate this problem." Broken System Rep't at 17.

Henggeler has asserted the defense of unconscionability of the agreement. The record is not sufficiently developed at this point in the litigation to determine the viability of that defense.[6] As noted, actions involving debt buyers raise additional concerns.

Accordingly,

IT IS ORDERED that:

1. Defendant Midland's Motion to Stay and to Compel Arbitration, or Alternatively, to Dismiss in Favor of Arbitration (Filing No. 45) is denied without prejudice to its reassertion at the completion of sufficient discovery.

2. Defendant Midland's objection to the plaintiff's citation of additional authority is over-ruled.

---

**6.** However, the court notes that Midland's reliance on *Cicle v. Chase Bank USA,* 583 F.3d at 555, for the proposition that the agreement is not unconscionable as a matter of law is misplaced. Although the Eighth Circuit Court of Appeals found, under Missouri law, that the arbitration agreement in a similar cardmember agreement was not unconscionable, the circumstances in that case differed significantly from those herein. First, there was no dispute that the parties had agreed to arbitrate. *Id.* at 557 (noting that "although it may be tempting," the court was reluctant to "allow the unfair credit card practices alleged in [the plaintiff's] claims against [the bank] (some of which are now or will soon be illegal) to color [the court's] analysis of the unconscionability of the arbitration provision to which [the plaintiff] agreed"). Also, *Cicle* involved a prominent notice of an arbitration agreement and a class-action waiver that had not been "foisted upon an unwary consumer only after she had begun using the card." *Id.* at 555. The agreement at issue therein had also afforded the consumer an opportunity to reject the changes. *Id.* Though the court also noted "[the bank's] superior bargaining position and the lack of opportunity in the ordinary course for negotiation between consumer and bank in the application for a credit card," it found that the defendant bank had not engaged in "high-pressure sales tactics to coerce" the consumer. *Id.* Further, the court found that cost-sharing and cost-shifting provisions in the cardmember agreement saved it from being unconscionable on its face. *Id.* at 557. Importantly, the *Cicle* case involved the entity that actually extended credit to the consumer—and not a debt buyer such as those involved in this action.